## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

CECILIA ROCIO MENDOZA,

      Plaintiff,

      vs.                                   Civ. No. 18-1065 KK

ANDREW SAUL, Commissioner
of the Social Security Administration,

      Defendant.

## MEMORANDUM OPINION AND ORDER[1]

THIS MATTER is before the Court on Plaintiff Cecilia Rocio Mendoza's ("Ms. Mendoza") Motion to Reverse and Remand for Rehearing with Supporting Memorandum (Doc. 25) ("Motion"), filed August 16, 2019, seeking review of the unfavorable decision of Defendant Andrew Saul, Commissioner of the Social Security Administration ("Commissioner"), on Ms. Mendoza's claim for Title II disability insurance benefits and Title XVI supplemental security income under 42 U.S.C. §§ 405(g) and 1383(c)(3). The Commissioner filed a response in opposition to the Motion on November 15, 2019 (Doc. 29), and Ms. Mendoza filed a reply in support of the Motion on December 2, 2019. (Doc. 32.) Ms. Mendoza additionally filed a Notice of Supplemental Authority on January 24, 2020 (Doc. 34), to which the Commissioner responded on January 31, 2020 (Doc. 35). Having meticulously reviewed the entire record and the applicable law and being otherwise fully advised in the premises, the Court FINDS that Ms. Mendoza's Motion is well taken and should be GRANTED.

## I.      Background

---

[1] Pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties have consented to the undersigned to conduct dispositive proceedings and order the entry of final judgment in this case. (Doc. 12.)

## A. Procedural History

In July 2014, Ms. Mendoza filed an application with the Social Security Administration ("SSA") for disability insurance benefits ("DIB") and supplemental security income ("SSI"). (Administrative Record ("AR") 250, 254.) She alleged a disability onset date of February 13, 2014 due to carpal tunnel syndrome, diabetes mellitus, high blood pressure, a thyroid disorder, neuropathy, and gastritis. (AR 088.) Disability Determination Services ("DDS") determined that Ms. Mendoza was not disabled both initially (AR 096) and on reconsideration. (AR 130.) Ms. Mendoza requested a hearing with an Administrative Law Judge ("ALJ") on the merits of her application. (AR 180-81.)

ALJ Michael Leppala held a hearing on April 3, 2017. (AR 036-85.) Ms. Mendoza and Vocational Expert ("VE") Sandra Trost testified. (Id.) ALJ Leppala issued an unfavorable decision on October 13, 2017. (AR 012-35.) The Appeals Council denied Ms. Mendoza's request for review on October 1, 2018 (AR 001-8), making the ALJ's decision the final decision of the Commissioner from which Ms. Mendoza appeals. *See Doyal v. Barnhart*, 331 F.3d 758, 759 (10th Cir. 2003).

## B. Ms. Mendoza's Background, Medical Treatment, and Hearing Testimony

Ms. Mendoza, age forty-seven, completed school through the ninth grade in Mexico and has worked packaging chiles in cans, packaging tortillas, cleaning restaurants, cooking in fast food restaurants, and as a dishwasher and housekeeper at a casino. (AR 045, 048-53.) She was first diagnosed with diabetes mellitus at age twelve and has used insulin therapy since that time to control her diabetes. (AR 376.) In July 2009 when Ms. Mendoza was thirty-six years old, Dr. Matthew Patton at New Mexico Orthopaedics performed bilateral carpal tunnel release surgery due to hand pain and finger numbness she was experiencing.[2] (AR 376, 460.) While her hand pain

---

[2] Women and persons with diabetes are known to be at a higher risk of developing carpal tunnel syndrome. *See Carpal Tunnel Syndrome Fact Sheet*, National Institute of Neurological Disorders and Stroke,

was noted to have improved following surgery, the numbness did not. (AR 376.) By May 2012, she complained to her primary care provider, Amy Weiss, NP, of severe pain in both hands and that she "[a]ctually feels like she can[]not use her hands at all due to the pain, but needs to work." (AR 685.) At that time, she was working as a dishwasher, having to lift heavy pots and pans. (Id.) In September 2013, NP Weiss provided Ms. Mendoza with a letter saying that she was unable to work due to her carpal tunnel syndrome. (AR 671.) She also prescribed Ms. Mendoza pain medication and referred her to New Mexico Orthopaedics for an evaluation of her right-hand pain. (AR 669.) Ms. Mendoza continued working until April 2014, when she was terminated from her job as a housekeeper at a casino due to frequent absences because of the medical problems she was experiencing. (AR 048, 271-72, 376.)

Ms. Mendoza sought care in Mexico in July 2014 for her hand and finger pain and received a steroid injection. (AR 460.) That same month, she filed her claims for DIB and SSI. (AR 250, 254.) She was referred to Ross Clark, M.D., ("Dr. R. Clark"[3]) for a consultative physical examination, which was performed in November 2014. (AR 376-81.) Dr. R. Clark documented the following physical examination findings:

> Examination of the hands and fingers bilaterally reveals decreased sensation to light touch throughout. The right [third] finger is affected by flexion contracture to the palm and does not extend normally. Attempted forced extension of the [third] finger by examiner results in severe pain. The fingers and hands are tender throughout. No crepitus is noted and no acute inflammation of the finger joints, erythema or swelling is noted. Hands and fingers are weak bilaterally with the inability to make a tight fist. Grip strength is quite weak bilaterally. In all, the claimant demonstrates significant dysfunction of both of her hands.

(AR 378.) Regarding Ms. Mendoza's functional physical limitations, he opined, *inter alia*, that due to her "carpal tunnel syndrome with persistent neuropathy and inability to extend her fingers

https://www.ninds.nih.gov/Disorders/Patient-Caregiver-Education/Fact-Sheets/Carpal-Tunnel-Syndrome-Fact-Sheet
(last visited Jan. 30, 2020).
[3] Ms. Mendoza was also treated by Dr. James Clark, who will be referred to as "Dr. J. Clark" for clarity.

normally[,]" she is limited to occasional reaching, handling, feeling, grasping, and fingering.[4] (AR 380.)

In January 2015, Ms. Mendoza returned to New Mexico Orthopaedics on NP Weiss's referral and was again seen by Dr. Patton. (AR 460.) She reported experiencing continuous, severe aching in both hands, right worse than left, with worsening pain upon bending, movement of the area, and grasping. (AR 460.) Dr. Patton noted impressions of bilateral carpal tunnel syndrome and right long-finger trigger finger. (AR 461.) Although Ms. Mendoza expressed interest in revision carpal tunnel release, Dr. Patton advised against proceeding directly to surgery and instead scheduled Ms. Mendoza for additional nerve studies. (Id.) To treat Ms. Mendoza's trigger finger, Dr. Patton recommended surgical release. (AR 461.)

On January 21, 2015, Dr. Evan Knaus performed the nerve conduction study ordered by Dr. Patton. (AR 454-55.) He indicated that the results of the study were "abnormal[,]" concluding that there was electrodiagnostic evidence of (1) bilateral median nerve mononeuropathy at the wrist with demyelinating changes affecting the sensory fibers, and (2) possible right ulnar neuropathy at the elbow with demyelinating changes affecting the motor fibers. (AR 456-57.)

On February 2, 2015, Dr. Patton performed trigger release surgery on Ms. Mendoza's right long finger and injected Ms. Mendoza's right wrist with steroids. (AR 458-59.) At Ms. Mendoza's follow-up appointment in March 2015, Dr. Patton noted that Ms. Mendoza reported that her pain had improved post-surgery. (AR 450.) However, because she continued to have "multiple

---

[4] In the context of nonexertional limitations, "occasionally" means an individual can only perform the activity "from very little up to one-third of the time"—i.e., up to approximately two-and-a-half hours per day. *See* SSR 85-15, 1985 WL 56857, at *6 (Jan. 1, 1985); *cf.* SSR 96-8P, 1996 WL 374184, at *7 (July 2, 1996) ("In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule)[.]").

complaints about multiple parts of her arms," Dr. Patton referred her for physical therapy. (AR 451.)

Ms. Mendoza attended physical therapy on April 7 and 16, 2015.[5] (AR 445-49.) She also saw NP Weiss on April 16 and complained to her of difficulty with grip and strength ever since having surgery in February. (AR 604.) She reported that physical therapy did not seem to be helping and that activity aggravated her pain, but rest helped. (Id.) She requested wrist splints, which NP Weiss prescribed. (AR 604-05.) In January 2016, Ms. Mendoza returned to NP Weiss, complaining of bilateral hand pain. (AR 584.) She reported having numbness in certain fingers and that her pain had worsened over the last few months. (Id.) She additionally reported that she "can[]not lift anything, or hold objects well[.]" (Id.) NP Weiss documented Ms. Mendoza's musculoskeletal strength at that time as "2+/5+ bilat[erally] (can't close hands well), no atrophy." (AR 585.)

In April 2016, Ms. Mendoza was seen at Presbyterian Medical Group ("PMG") Orthopedics by Eric Hardy, P.A., for complaints of hand and elbow pain. (AR 435.) Noting that Ms. Mendoza had undergone carpal tunnel release surgery in 2009, which afforded "mild relief of symptoms" but that "now her symptoms have recurred and are worse[,]" and that a February 2016 nerve conduction study confirmed bilateral carpal tunnel syndrome and ulnar nerve neuropathy, P.A. Hardy recommended "maximiz[ing] conservative treatment[,]" including continued use of splinting and resuming occupational therapy, before considering surgery. (AR 417-22, 437.)

Ms. Mendoza was first seen by Karen Harley, OT, at PMG Occupational Therapy on May 6, 2016 on P.A. Hardy's referral for treatment of "[b]ilateral hand pain, stiffness and weakness that limits function[.]" (AR 956-60.) OT Harley observed that Ms. Mendoza's "fingers are

---

[5] Records from New Mexico Orthopaedics indicate that Ms. Mendoza was discharged from physical therapy after cancelling or failing to show up for scheduled appointments following her April 16 appointment. (AR 443-44.)

postured in moderate flexion and she lacks full finger flexion." (AR 956.) She also documented positive results for Tinel's sign test and tenderness to palpation of both wrists and hands. (AR 956.) Her functional assessment provided:

> The patient has been having neural symptoms for years that seem to be progressing and has [electromyography-]confirmed [carpal tunnel syndrome] and Ulnar nerve compression. She has limited [range of motion] in hands due to protective use that limits her function. Therapy probably will not be able to reverse the current neural symptoms from the compression but it should be able to improve her [range of motion] and help manage her pain and increase strength as possible.

(AR 959.) She assigned Ms. Mendoza range-of-motion exercises for her fingers, thumbs, and wrist as part of a home exercise program and recommended use of heat to reduce her pain and improve soft tissue extensibility. (AR 958.) At a follow-up appointment a few days later, Ms. Mendoza reported having pain in her forearms and hands and that she did not feel much of a change despite doing her exercises and using heat. (AR 984.) OT Harley noted that following heat therapy and performing exercises at her appointment, Ms. Mendoza showed improvement in her range of motion. (AR 986.) At her appointment two days later with Lynn Burns, OT, Ms. Mendoza reported numbness. (AR 1002.) She received heat therapy and was given additional exercises for her home exercise program. (AR 1002-3.)

On May 26, 2016, Ms. Mendoza saw James Clark, M.D., ("Dr. J. Clark") at PMG Orthopedics. (AR 438-42.) Dr. J. Clark noted that an x-ray taken in April 2016 showed no acute or chronic bony abnormalities but that the nerve study performed in February 2016 indicated "mild to moderate bilateral carpal tunnel syndrome." (AR 439.) He noted the following physical examination findings:

> On examination of bilateral hands today, the patient does not have any thenar atrophy. She is very hesitant to move her forearms or her hands and holds them in a cradle position. She has well[-]healed incisions. No signs of infection. Sensation appears to be intact to light touch at the ulnar, radial, and medial nerve distribution.

> Brisk capillary refill. Attempting provocative maneuvers causes her discomfort diffusely about the hand.

(AR 439.) He declined to recommend surgical intervention "due to the patient's blood sugars and other multiple comorbidities" and opined that "all of her symptoms may not be relieved with a repeat carpal tunnel release." (AR 439.) He advised her that he would not even consider surgical intervention until her blood sugars were under control and noted that he would "have her back on an as-needed basis if she has any further concerns or questions." (AR 439.)

At an appointment with OT Burns on May 31, 2016, Ms. Mendoza reported that she was "using her left hand to drive, as her right hand is very painful." (AR 1059.) She again received heat therapy and was given additional exercises to complete. (AR 1059-60.) On June 10, 2016, OT Harley noted that Ms. Mendoza "reports that therapy is helping to reduce her pain though the cramping and paresthesias continue and she wants to have more treatment on a weekly basis." (AR 1076.) OT Harley indicated that while Ms. Mendoza "comes into clinic not moving through full [range of motion,]" she "easily gains hand [range of motion] with treatment." (AR 1078.) On June 15, 2016, Ms. Mendoza reported that she had no pain (0/10), only cramps. (AR 1098.) OT Harley noted that Ms. Mendoza reported continuing to work with her primary care physician "to get her blood sugar under control so she can have surgery." (AR 1099.) On June 17, 2016, Ms. Mendoza reported experiencing pain of 7/10 and that it was "hard to do anything." (AR 1116.) After receiving treatment, however, her pain rating was down to 0/10. (AR 1118.)

At Ms. Mendoza's discharge appointment on June 29, 2016, OT Harley noted that Ms. Mendoza reported "that overall her pain is better and her parethesias are improved. The patient is having more muscle cramping than pain." (AR 1134.) Regarding assessment of Ms. Mendoza's function and impairments, OT Harley noted:

> The patient's [range of motion] is [within defined limits] now and she has had a significant increase in strength. Her neural pain persists and more than likely will not improve without surgery, which she cannot have until her blood sugar is under control. She was encouraged to continue with her [home exercise program] so her function is as good as it can be if she has surgery.

(AR 1136-37.) Discharge forms noted that both Ms. Mendoza and OT Harley believed that Ms. Mendoza saw some improvement through therapy. (AR 1091.) Ms. Mendoza reported that while she had been unable to carry a shopping bag or briefcase upon intake, she felt at discharge that she would be able to, although "[w]ith severe difficulty." (AR 1092.) However, regarding all other functional activities, Ms. Mendoza continued to report that she would only be able to do things such as drive, groom her hair, put on a pullover sweater, and push up on her hands (e.g., from the bathtub or a chair) "[w]ith severe difficulty." (AR 1092.)

At a follow-up medication-management appointment in June 2016, NP Weiss noted "joints in hands and feet enlarged" but "no swelling noted." (AR 569.) In December 2016, Ms. Mendoza requested a refill of tramadol for her "[c]hronic wrist pain[,]" which NP Weiss provided. (AR 541, 543.) In February 2017, Ms. Mendoza was seen again for "[p]ain on [sic] both hands." (AR 537.)

At her hearing before ALJ Leppala in April 2017, Ms. Mendoza testified that her hands are the primary reason that she is unable to work fulltime. (AR 054.) She explained that she is able to do "practically nothing" with them and that she "can't use them." (AR 054.) She testified that she is able to go to the bathroom and wash her hands and that she tries to feed herself but that she is unable to do any other things around the house. (AR 055.) She explained that when it comes to eating and drinking, she does those things "as carefully as I can because sometimes I'm embarrassed with my daughter because she's the one that helps me for everything." (Id.) Function Reports that Ms. Mendoza's daughter helped her complete in July 2015 indicated that Ms.

Mendoza's daughter helps her with things like bathing, brushing her hair, getting dressed, using the bathroom, cooking, and housekeeping. (AR 322, 323, 328, 332, 333, 338.)

## C.     State Agency Reviewers' Opinions

In January 2015, non-examining State agency physician Dr. Lawrence Kuo found at the initial level that the only severe impairment Ms. Mendoza suffered from was peripheral neuropathy. (AR 091.) He opined that Ms. Mendoza was able to perform light work with the following postural and manipulative limitations: (1) postural limitations: occasional climbing of ramps, stairs, ladders, ropes, and scaffolds; occasional balancing, stooping, kneeling, crouching, and crawling; (2) manipulative limitations: frequent bilateral fingering and handling; unlimited feeling.[6] (AR 092-94, 96.) He acknowledged that Dr. R. Clark opined that Ms. Mendoza had greater limitations than those he found, but he explained that he found that Dr. R. Clark's "opinion is an overestimate of the severity of the individual's restrictions/limitations and based only on a snapshot of the individual's functioning." (AR 095.) While he explained why he disagreed with Dr. R. Clark's opinions regarding Ms. Mendoza's exertional limitations, he offered no explanation regarding why he disagreed with Dr. R. Clark's opinions as to Ms. Mendoza's non-exertional, i.e., postural and manipulative, limitations. (AR 094.)

At the reconsideration level in October 2015, Dr. T. Bessent found that Ms. Mendoza suffered from not only severe peripheral neuropathy but also diabetes mellitus and, secondarily, carpal tunnel syndrome. (AR 125.) Like Dr. Kuo, he opined that Ms. Mendoza would be able to perform light work with certain postural and manipulative limitations. (AR 126-27, 130.) While he found that Ms. Mendoza should be restricted to never climbing ladders, ropes, or scaffolds due

---

[6] In the context of nonexertional limitations, "frequently" indicates an ability to perform specified activities "from one-third to two-thirds of the time"—i.e., up to more than five hours per day. *See* SSR 85-15, 1985 WL 56857, at *6; *cf.* SSR 96-8P, 1996 WL 374184, at *7.

to her neuropathy, he agreed with all other postural and manipulative limitations that Dr. Kuo found, including that Ms. Mendoza was able to handle and finger frequently. (AR 126-27.) Dr. Bessent—who did not believe there were any other opinions of record assessing greater restrictions and requiring reconciliation with his opinions (AR 129)—did not offer any explanation regarding why he disagreed with Dr. R. Clark's opinions regarding Ms. Mendoza's exertional, postural, and manipulative limitations.

## D.    The VE's Testimony and the ALJ's Decision

At the administrative hearing, the ALJ presented VE Trost with four hypothetical residual functional capacity ("RFC") assessments. (AR 075.) The ALJ's first hypothetical asked VE Trost to consider someone with the RFC to perform light work with the following limitations: occasionally climbing ramps or stairs; never climbing ladders, ropes, or scaffolds; occasionally balancing, stooping, kneeling, crouching, and crawling; *frequently* handling and fingering bilaterally; and avoiding concentrated exposure to extreme cold, concentrated exposure to vibration, and all exposure to hazards. (AR 076-77.) VE Trost testified that someone with the foregoing RFC would be able to perform one of Ms. Mendoza's past jobs—cleaner—as well as certain other jobs in the national economy, specifically marker and car wash attendant. (AR 076-79.) The ALJ's second hypothetical was the same as the first but changed the handling and fingering limitation from "frequent" to "occasional." (AR 079.) VE Trost testified that a person with this more restrictive limitation would not be able to perform either Ms. Mendoza's past work or any other jobs in the national economy. (AR 079-80.) The ALJ's third hypothetical involved an exertional limitation to sedentary, rather than light, work and postural and manipulative limitations as noted in the first hypothetical, i.e., with the less restrictive handling and fingering limitation of "frequent." (AR 080.) VE Trost testified that a person with that RFC would not be able to perform

Ms. Mendoza's past work but identified three other jobs in the national economy—toy stuffer, table worker, and surveillance systems monitor—that such a person would be able to perform. (AR 080-81.) The ALJ's final hypothetical kept the exertional level at sedentary and included the more restrictive handling and fingering limitation of "occasional." (AR 081.) VE Trost testified that the only job a person with that RFC could perform was surveillance systems monitor, a job for which she noted 16,508 jobs are available nationally. (AR 081.)

In his decision, the ALJ found that Ms. Mendoza's "severe impairments" include "diabetes mellitus, peripheral neuropathy, degenerative disc disease of the lumbar spine, and carpal tunnel syndrome[.]" (AR 021.) Finding that the record did not support finding any of Ms. Mendoza's "severe impairments" presumptively disabling[7] (AR 022-23), he proceeded to assess Ms. Mendoza's RFC to determine whether she could either return to her past relevant work or make an adjustment to other work. (AR 023-28.) *See* 20 C.F.R. § 404.1520(a)(4) (setting forth the five-step sequential evaluation process the SSA follows in evaluating DIB claims); *Wall v. Astrue*, 561 F.3d 1048, 1052 (10th Cir. 2009). The ALJ assessed Ms. Mendoza as having the following RFC:

> I find that the Claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except the Claimant is limited to occasionally lifting and/or carrying 20 pounds, frequently lifting and/or carrying 10 pounds, standing and/or walking about 6 hours in an 8-hour workday, and sitting for about 6 hours in an 8-hour workday, all with normal breaks. She further is limited to occasionally climbing ramps or stairs, never climbing ladders, ropes, or scaffolds, occasionally balancing, occasionally stooping, occasionally kneeling, occasionally crouching, and occasionally crawling. The Claimant is limited to *frequent* bilateral handling and fingering and must avoid concentrated exposure to extreme cold, concentrated exposure to vibration, and all exposure to hazards.

(AR 023 (emphasis added).) In discussing the evidence supporting this RFC, the ALJ considered, *inter alia*, the medical opinions of record, according "partial weight" to the opinions of Dr. R.

---

[7] The ALJ additionally found as severe impairments right plantar fasciitis, post right knee meniscus repair, bilateral heel spurs, unspecified bipolar disorder, and attention deficit hyperactivity disorder.

Clark, "significant weight" to the opinions of Dr. Kuo, and "great weight" to the opinions of Dr. Bessent. (AR 027-28.) Regarding Dr. R. Clark's opinions, the ALJ found that Ms. Mendoza's "limitations on lifting/carrying and manipulative limitations are not as severe as assessed by Dr. [R.] Clark and are unsupported by the objective findings during his one-time examination." (AR 027.) He gave four reasons for rejecting Dr. R. Clark's opinions regarding Ms. Mendoza's lifting/carrying and manipulative limitations: (1) Ms. Mendoza "had normal ambulation without an assistive device[,]" (2) she had "5/5 strength of her upper and lower extremities bilaterally[,]" (3) "[i]maging evidence of both hands was within normal limits[,]" and (4) Dr. R. Clark's examination "predates the Claimant's trigger finger release on the right hand in February 2015[.]" (AR 027.) Regarding Dr. Bessent's opinions, the ALJ explained, "I assign great weight to this assessment, as it is well supported by the overall evidence of record. In addition, Dr. Bessent has disability program knowledge." (AR 028.)

After determining Ms. Mendoza's RFC, the ALJ proceeded to find that Ms. Mendoza is capable of performing her past work as a cleaner based on VE Trost's testimony. (AR 028-29.) Alternatively, the ALJ found that Ms. Mendoza was not disabled based on his conclusion that given her education, work experience, and RFC, she is capable of making a successful adjustment to other work that exists in significant numbers in the national economy. (AR 029-30.)

## II. Discussion

Ms. Mendoza argues, *inter alia*, that the ALJ's finding that Ms. Mendoza is able to handle and finger frequently is contrary to substantial evidence and that the ALJ committed legal error in his consideration of Dr. R. Clark's opinions, which supported a more restrictive handling and fingering limitation. (Doc. 25 at 6-12.) The Commissioner contends that the ALJ's handling and fingering limitation is supported by substantial evidence and that the ALJ reasonably weighed the

opinion testimony related to that limitation. (Doc. 29 at 6-9.) The Court agrees with Ms. Mendoza that the ALJ's decision fails to evince application of the correct legal standards for weighing the medical opinions of record and that remand is required.

## A.      Applicable Law

### 1.      Standard of Review

Judicial review of the Commissioner's denial of disability benefits is limited to whether the final decision is supported by substantial evidence and whether the Commissioner applied the correct legal standards to evaluate the evidence. 42 U.S.C. § 405(g); *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004). "The failure to apply the correct legal standard or to provide this court with a sufficient basis to determine that appropriate legal principles have been followed is grounds for reversal." *Jensen v. Barnhart*, 436 F.3d 1163, 1165 (10th Cir. 2005) (alteration and quotation marks omitted). In making these determinations, the Court must meticulously examine the entire record but may neither reweigh the evidence nor substitute its judgment for that of the Commissioner. *Flaherty v. Astrue*, 515 F.3d 1067, 1070 (10th Cir. 2007). In other words, the Court does not reexamine the issues de novo. *Sisco v. U.S. Dep't of Health & Human Servs.*, 10 F.3d 739, 741 (10th Cir. 1993). The Court will not disturb the Commissioner's final decision if it correctly applies legal standards and is based on substantial evidence in the record.

"Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004) (internal quotation marks omitted). Substantial evidence is "more than a scintilla, but less than a preponderance." *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007). A decision "is not based on substantial evidence if it is overwhelmed by other evidence in the record[,]" *Langley,* 373 F.3d at 1118 (internal quotation marks omitted), or "constitutes mere conclusion." *Musgrave v.*

13

*Sullivan,* 966 F.2d 1371, 1374 (10th Cir. 1992). The Court's examination of the record as a whole must include "anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." *Grogan v. Barnhart*, 399 F.3d 1257, 1262 (10th Cir. 2005).

## 2. Weighing Opinion Evidence

"[W]hen assessing a plaintiff's RFC, an ALJ must explain what weight is assigned to each opinion and why." *Silva v. Colvin*, 203 F. Supp. 3d 1153, 1157 (D.N.M. 2016). In considering the medical opinions of record, the ALJ should generally accord more weight to the opinion of a source who has examined the claimant than to the opinion of a source who has rendered an opinion based on a review of medical records alone. *See* 20 C.F.R. §§ 404.1527(c)(1), 416.927(c)(1); *Chapo v. Astrue*, 682 F.3d 1285, 1291 (10th Cir. 2012) ("[A]n examining medical-source opinion is . . . given particular consideration: it is presumptively entitled to more weight than a doctor's opinion derived from a review of the medical record."); *cf. Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004) ("The opinion of an examining physician is generally entitled to less weight than that of a treating physician, and the opinion of an agency physician who has never seen the claimant is entitled to the least weight of all."). "If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." SSR 96-8P, 1996 WL 374184, at *7 (July 2, 1996). Medical opinions must be weighed using the factors set forth in 20 C.F.R. § 404.1527(c), comprising (1) examining relationship, (2) treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) other factors.[8] To be sure, "[n]ot every factor for weighing opinion evidence will apply in every case," SSR 06-03P, 2006 WL 2329939,

---

[8] The SSA has issued new regulations regarding the evaluation of medical source opinions for claims filed on or after March 27, 2017. *See* "Revisions to Rules Regarding the Evaluation of Medical Evidence," 82 Fed. Reg. 5844-01, 2017 WL 168819 (Jan. 18, 2017); 20 C.F.R. 404.1527 and 404.1520c. Because Ms. Mendoza filed her claims in 2014, the previous regulations still apply to this matter. *Id.*

at *5 (Aug. 9, 2006) [9], and the ALJ is not required to "apply expressly each of the six relevant factors in deciding what weight to give a medical opinion." *Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007). Rather, what is required is that the ALJ provide good reasons for the weight he gives an opinion and that his explanation is sufficiently specific to make it clear to any subsequent reviewers the weight given to an opinion and the reasons for that weight. *See id*. An ALJ's failure to set forth adequate reasons explaining why a medical opinion was rejected or assigned a particular weight and demonstrate that he has applied the correct legal standards in evaluating the evidence constitutes reversible error. *See Reyes v. Bowen*, 845 F.2d 242, 244 (10th Cir. 1988) (explaining that the failure to follow the "specific rules of law that must be followed in weighing particular types of evidence in disability cases . . . constitutes reversible error").

## B.     The ALJ Committed Legal Error in Weighing the Medical Opinions

As noted previously, the ALJ generally accorded greater weight to the opinions of non-examining state agency reviewers Drs. Kuo and Bessent than to the opinions of consultative examiner Dr. R. Clark. (AR 027-28.) Regarding the medical opinions about Ms. Mendoza's abilities to handle and finger, specifically, the ALJ adopted the opinions of Drs. Kuo and Bessent that Ms. Mendoza is able to handle and finger frequently and rejected Dr. R. Clark's opinion that Ms. Mendoza is limited to occasional handling and fingering. (Id.)

As a consultative examiner, Dr. R. Clark's opinions were presumptively entitled to greater weight than those of non-examining reviewers Dr. Kuo and Dr. Bessent. *See Chapo*, 682 F.3d at 1291. That is because "[t]he regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker." SSR

---

[9] The Court acknowledges that certain Social Security Rulings, including SSR 06-03P, that the Court relies on in its analysis have been rescinded effective for claims filed on or after March 27, 2017. *See* SSR 96-2P, 2017 WL 3928298, at *1 (Mar. 27, 2017). However, as noted above, Ms. Mendoza filed her claim for disability insurance benefits in 2014 (AR 250, 254), meaning the rescinded rulings and case law interpreting them are still applicable.

96-9P, 1996 WL 374180, at *2 (July 2, 1996). To justify rejecting Dr. R. Clark's opinion regarding Ms. Mendoza's handling and finger limitation in favor of Drs. Kuo's and Bessent's, the ALJ was required to (1) demonstrate consideration of all of the applicable regulatory factors for weighing non-controlling medical opinions, and (2) provide "specific, legitimate reasons" for rejecting Dr. R. Clark's opinions. *See* 20 C.F.R. §§ 404.1527(c), 416.927(c); *Chapo*, 682 F.3d at 1291 (explaining that dismissal or discounting of an examining source's opinions must be "based on an evaluation of all of the factors set out in [20 C.F.R. §§ 404.1527(c), 416.927(c)] and the ALJ must provide specific, legitimate reasons for rejecting [such opinions]" (quotation marks omitted)). Additionally, the ALJ was to have applied a "stricter standard" in weighing the opinions of Drs. Kuo and Bessent "based to a greater degree on medical evidence, qualifications, and explanations for the opinions[.]" SSR 96-9P, 1996 WL 374180, at *2. Indeed, to be accorded any weight, much less greater weight than an examining source, their opinions were required to be supported by the evidence contained in the record as a whole, including evidence received after their opinions were rendered. *See id.* ("[T]he opinions of State agency medical . . . consultants . . . can be given weight only insofar as they are supported by evidence in the case record, considering such factors as the supportability of the opinion in the evidence including any evidence received at the administrative law judge and Appeals Council levels that was not before the State agency[.]"). The ALJ's decision in this case fails to evince compliance with the foregoing standards.

While the ALJ was not required to explicitly discuss how he considered all six regulatory factors in weighing Dr. R. Clark's opinions, *see Oldham*, 509 F.3d at 1258, his decision was required to evince—through the provision of "good reasons" for the weight he assigned Dr. R. Clark's opinions—that he at least considered all of the factors in determining what weight to give those opinions. *See Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003) ("After considering

the pertinent factors, the ALJ must 'give good reasons in the notice of determination or decision' for the weight he ultimately assigns the opinion." (alteration omitted) (citing 20 C.F.R. § 404.1527(d)(2))). It does not. The ALJ's lone reason for rejecting Dr. R. Clark's opinion regarding Ms. Mendoza's ability to handle and finger—that it is "unsupported by the objective findings during his one-time examination"—is legally inadequate, both facially and substantively. Moreover, the specific evidence the ALJ cited to support his finding that Dr. R. Clark's opinion was "unsupported" fails to provide good reasons for rejecting Dr. R. Clark's handling and fingering opinion.

As an initial matter, medical opinions must be weighed vis-à-vis their consistency with and supportability based on the record as a whole, not insularly vis-à-vis the medical source's records—or, in this case, one-time examination report—alone. *See* 20 C.F.R. §§ 404.1527(c), 416.927(c). To the extent the ALJ rejected Dr. R. Clark's opinion because he found it to be inconsistent with and/or unsupported by certain findings documented in Dr. R. Clark's own report without considering the opinion's consistency with the record as a whole, that alone constitutes legal error. *See id.* Additionally, while supportability based on objective findings and frequency of examination are two factors that may be considered in weighing medical opinions, neither is dispositive on either the specific evidence cited by the ALJ or the record in general in this case. Rather than reflecting proper consideration of all of the applicable factors, the ALJ's rejection of Dr. R. Clark's handling and finger opinion rests on impermissible picking and choosing among medical reports. *See Hardman v. Barnhart*, 362 F.3d 676, 681 (10th Cir. 2004) ("It is improper for the ALJ to pick and choose among medical reports, using portions of evidence favorable to his position while ignoring other evidence."); *Clifton v. Chater*, 79 F.3d 1007, 1010 (10th Cir. 1996) (explaining that an ALJ must discuss not only the evidence supporting his decision but also "the

uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects").

The ALJ cited four pieces of evidence to support his rejection of Dr. R. Clark's opinions regarding Ms. Mendoza's lifting/carrying and manipulative limitations. (AR 027.) Three of them are relevant to his rejection of Dr. R. Clark's opinion that Ms. Mendoza is limited to occasional handling and fingering[10]: (1) Ms. Mendoza "had 5/5 strength of her upper . . . extremities bilaterally"; (2) "Imaging evidence of both hands was within normal limits"; and (3) Dr. R. Clark's "examination predates [Ms. Mendoza's] trigger finger release on the right hand in February 2015[.]" (AR 027.) While the evidence cited is concededly specific, it fails to constitute "legitimate reasons" for rejecting Dr. R. Clark's handling and fingering opinion. The Court explains.

While true that Dr. R. Clark noted that Ms. Mendoza demonstrated normal upper extremity strength during her neurological examination (AR 379), he also noted that her physical examination revealed that her "[h]ands and fingers are weak bilaterally with the inability to make a tight fist. Grip strength is quite weak bilaterally." (AR 378.) He additionally documented that she was "able to retrieve a pen from the tabletop with both hands but does so quite awkwardly." (AR 379.) In explaining the functional limitations he assessed Ms. Mendoza as having, Dr. R. Clark took care to explain that he attributed his limitation of Ms. Mendoza to only occasional handling and fingering to "carpal tunnel syndrome" and her "inability to extend her fingers normally[,]" specifically noting "a very weak grip strength and awkward ability to manipulate small objects[.]" (AR 380.) Critically, Dr. R. Clark's finding regarding Ms. Mendoza's hand and finger strength is consistent with and supported by other evidence in the record that the ALJ ignored. Specifically, in April 2015, Ms. Mendoza reported to NP Weiss that she had "been having

---

[10] The fourth piece of evidence cited—that Ms. Mendoza "had normal ambulation without an assistive device"— plainly does not relate to Dr. R. Clark's manipulative limitation opinion.

a hard time with grip and strength" ever since her trigger-finger release surgery. (AR 604.) In January 2016, NP Weiss documented Ms. Mendoza's musculoskeletal strength as "2+/5+ bilat[erally] (can't close hands well)." (AR 585.) In May 2016, OT Hardy noted that Ms. Mendoza continued to struggle with strength in her hands and forearms. (*See* AR 956-59.) At her initial appointment with OT Hardy, Ms. Mendoza registered a right-hand grip strength average of twenty-two pounds, and a left-hand grip strength average of twelve pounds. (AR 957.) With occupational therapy, Ms. Mendoza's grip strength improved to forty-one-and-a-half pounds for her right hand, and thirty-seven-and-a-half pounds for her left. (AR 1136.) While seemingly a significant increase, Ms. Mendoza's post-therapy grip strength was still less than that of an average 70-79-year-old woman with three or more chronic diseases.[11] The ALJ's decision fails to mention, much less address, any of this evidence, all of which tends to support and demonstrate the consistency of Dr. R. Clark's opinion regarding Ms. Mendoza's handling and fingering limitations with the substantial evidence of record. Viewed properly in context, both within Dr. R. Clark's own report and vis-à-vis the record as a whole, Dr. R. Clark's notation of "5 out of 5 strength at the shoulder, elbow, wrist, and hands bilaterally" cannot reasonably be construed as a legitimate reason for the ALJ to reject his handling and fingering opinion.[12] *See Hardman*, 362 F.3d at 681; *Clifton*, 79 F.3d at 1010.

---

[11] *See* Amy Yorke, PT, Ph.D., NCS, *et al.*, Grip Strength Values Stratified by Age, Gender, and Chronic Disease Status in Adults Aged 50 Years and Older, J. of Geriatric Physical Therapy, July/Sept. 2015 v. 38 issue 3, 115-121, available at https://journals.lww.com/jgpt/Fulltext/2015/07000/Grip_Strength_Values_Stratified_by_Age,_Gender,.2.aspx. Table 4 indicates that the mean right-hand grip strength for a woman age 70-79 with three or more chronic diseases is 20.8 kg, or 45.6 pounds.

[12] The Court additionally notes that to the extent the ALJ found Dr. R. Clark's consultative report to be internally inconsistent, he could have, but did not, recontact Dr. R. Clark to seek additional evidence or clarification on this pivotal issue. *See* 20 C.F.R. §§ 404.1520b(b)(2)(i), 416.920b(b)(2)(i) (providing that the SSA "may recontact your medical source" if it determines that there is an inconsistency or insufficiency in the evidence that prevents it from reaching a conclusion about whether the claimant is disabled).

Regarding the ALJ's other bases for finding that Dr. R. Clark's opinions were "unsupported," the fact that x-ray images taken in December 2014 indicated that Ms. Mendoza's hands were "within normal limits"—i.e., showed "[n]o definite bony or articular abnormalities" (AR 289)—is neither here nor there in light of the two additional positive nerve conduction tests that confirmed that Ms. Mendoza continued to suffer from carpal tunnel syndrome in 2015 and 2016. It is undisputed that numerous medical providers diagnosed Ms. Mendoza with and treated her for bilateral carpal tunnel syndrome despite "normal" x-rays of her hands. The ALJ provided no explanation of how the x-ray images render Dr. R. Clark's opinions "unsupported." Additionally, although Dr. R. Clark rendered his opinion that Ms. Mendoza is limited to only occasional handling and fingering prior to her 2015 right long finger trigger-finger release surgery, Dr. R. Clark based his opinion regarding Ms. Mendoza's manipulative limitations on her carpal tunnel syndrome, which he noted affected her hands and fingers generally, not on the condition of her right long finger alone. (*See* AR 378, 380.) The ALJ's rationale in that regard is further diminished—if not altogether negated—by uncontroverted evidence indicating that Ms. Mendoza continued to experience hand and wrist pain, diminished grip strength, and other symptoms stemming from her carpal tunnel syndrome well after her 2015 trigger-finger release surgery. Again, the ALJ offered no explanation of the significance of the fact that Dr. R. Clark's opinion was rendered prior to Ms. Mendoza's trigger release surgery when his handling/fingering opinion was primarily tied to Ms. Mendoza's carpal tunnel syndrome, a condition that was unaffected by the 2015 surgery and continued to affect Ms. Mendoza's functional abilities. Based on the foregoing, the Court concludes that the ALJ failed to provide specific, legitimate reasons for rejecting Dr. R. Clark's handling and fingering opinion.

As a final point regarding the legal deficiency of the ALJ's handling of the medical opinions, the Court briefly notes that equally dubious as the reasons the ALJ gave for discounting Dr. R. Clark's opinions are the conclusory reasons he gave for according "significant" and "great" weight, respectively, to the opinions of non-examining state agency consultants Dr. Kuo and Dr. Bessent. Regarding Dr. Kuo's opinion, the ALJ assigned it "significant weight . . . as it was consistent with the evidence available at the time and Dr. Kuo has disability program knowledge." (AR 028.) Setting aside that a non-examining source's opinions must be weighed in light of the record as a whole—including evidence acquired after the source renders his opinion—and not just based on whether they are consistent with the evidence available at the time, the ALJ cited not a single piece of evidence supporting Dr. Kuo's handling and fingering opinion or even suggesting that it was consistent with the record as a whole. He likewise cited no evidence to support his conclusory finding that Dr. Bessent's opinion "is well supported by the overall evidence of record." (AR 028.) Particularly given that Drs. Kuo's and Bessent's opinions were to be weighed under a "stricter standard" owing to their non-examining status, SSR 96-9P, 1996 WL 374180, at *2, the ALJ's failure to articulate clear reasons—tied to specific evidence reflecting consideration of the record as a whole—for the weight he assigned their opinions is problematic and a further indication that he failed to comply with the correct legal standards for weighing the medical opinions of record.

Remand is required for proper evaluation of the medical opinions in this case.

## C. The Court does not reach Ms. Mendoza's other claims of error.

Because remand is required as set forth above, the Court does not address the merits of Ms. Mendoza's remaining arguments. *See Watkins*, 350 F.3d at 1299 (explaining that the reviewing

court need not reach issues raised that "may be affected by the ALJ's treatment of th[e] case on remand").

### III.    <u>Conclusion</u>

For the reasons stated above, Ms. Mendoza's Motion to Reverse and Remand for a Rehearing with Supporting Memorandum (Doc. 25) is GRANTED.

IT IS SO ORDERED.

_____
KIRTAN KHALSA
United States Magistrate Judge
Presiding by Consent